We finished the prior argument a few minutes before 11. I wasn't sure if everyone was really here. Council, whenever you're ready, you may proceed. No, Major, they don't know why there's only two of us. Probably not. Let me, for the record again, for the benefit of those council who came in later, it's obvious there are only two of us on the bench. Justice Fomer, for various reasons, was not able to make the actual oral argument. The oral argument will be available to him. He will be a full participant in all of the cases docketed for today, oral and non-oral. And so I wanted to inform you of that. Thank you. Thank you, Council. Good morning, Your Honors. May it please the Court and the Council, I'm Dwayne Schuster. I'm with the State Appellate Defender in Springfield, and I represent the defendant, Gary Pate. Mr. Pate was convicted of the first-degree murders of Kathleen Pate and Amanda Jeffers, and he was sentenced to death. On March 9, 2011, the governor commuted his sentence to natural life imprisonment, and the case was subsequently transferred to the Fifth District. Your Honors, today I would like to focus primarily upon the first two issues presented in my brief. I will certainly welcome any questions as to the other issues and try to answer any questions you have to the best of my ability. So I would like to start out with the issue concerning the Sixth Amendment right to an impartial jury. Your Honors, the Sixth Amendment to the Federal Constitution and Article I, Section 8 of the Illinois Constitution guarantee and accuse the right to a fair trial by an impartial jury. Now, the trial judge here denied Gary Pate's request for a change of venue away from White County, where the murders had occurred. Now, I acknowledge that appellate review of that decision is deferential. However, the case law also recognizes that a presumption of prejudice arises where the defendant can establish reasonable grounds to believe that prejudice actually exists, and that by reason of this prejudice, there is a reasonable apprehension that he cannot receive a fair and impartial trial. Did the trial court deal with that by saying, let's see if we can actually make a jury? Yes, yeah. He stated that on the record more than once. I remember him saying almost exactly that. Let's see if we can pick a jury here. Now, it's interesting that you should ask that because there were multiple motions for change of venue in this case. And that's – I find that very instructive. I think defense counsel, we're anticipating that the trial judge is going to try to do this, but if we don't think that that clears up the matter once he picks a jury, we're going to preserve the issue. I think there's a very good reason for that because of this idea about a presumption of prejudice under certain circumstances. And, you know, I outlined the Illinois decisions. There are various Illinois decisions that talk about that. What is most relevant to this case is that while Mr. Cate's appeal was pending, the United States Supreme Court spoke on the issue and spoke quite clearly in Skilling v. United States. And under the four factors discussed in Skilling v. United States, a presumption of prejudice arose in this case that entitled Gary Cate to a change of venue. Now, one of the factors that Skilling talks about is the size and characteristics of the community in which the crime occurred. And that's considered in the milieu of, you know, what kind of publicity was going on, the intensity of publicity, matters such as that. And here the trial judge refused to move venue away from the county where violent shooting occurred, two people were killed. A county with a little over 11,000 registered voters, many of whom were saturated with news coverage of the event for a period of nearly two years from indictment, from arrest up until trial, and many of whom were well acquainted with the defendant, with the victims, and with many of the witnesses. Now, the second factor that Skilling looks at is how inflammatory was the news coverage. Well, defense counsel in this case, through multiple motions for change of venue and attaching voluminous appendices to those motions, made a very good record that the news stories concerning Gary Cate from the time of the offense all the way up to the time of trial, routinely discussed blatantly prejudicial information about the case, such as reports that he had confessed, reports that he was considering pleading guilty. There were several newspaper articles, and I remember from my research of the case, there's a video in the record of a television news interview with the defendant's former wife, Michelle Crawford, who made numerous inflammatory statements about allegedly violent acts he had committed in the past, allegedly criminal acts he had committed, alleged threats that he had made for her, none of which the state ever introduced at the trial, because the state never called Michelle Crawford. So the state never established the facts on any of those allegations, and never allowed her to be subject to cross-examination as to the veracity and credibility. The third factor that Skilling emphasizes is the time that elapsed between the indictment and the trial. And this one, you know, I acknowledge this one is a closer call in this case. It's a little more neutral than the other two that I just talked about. You had almost two years from the time of the arrest to the time of the trial. However, again, I go back to the motions that defense counsel filed, and the documentation that they provided in those motions for change of venue. It indicates the publicity never stopped, and the intensity of the publicity never stopped during those two years. And the inflammatory nature of many of those news reports never stopped during the entire two years. There was no recognizable temporal break between the onslaught of the news coverage and the beginning of the jury trial in this case. And the fourth factor that Skilling emphasizes is, look at the final verdicts. Was it a multi-count indictment? If it was, were there any acquittals in the case? In this case, there were not. Now, here the jury convicted on all six counts, so there's nothing inherent in the verdicts themselves that would dispel a presumption of prejudice arising from the other three factors that I just discussed. So the four factors discussed in Skilling, which actually they put a context and a gloss on the principles that Illinois cases like People v. Taylor and People v. Denver recognized years ago. They put the presumption of prejudice into context, and those four factors establish that prejudice should be presumed in this case, and therefore, this court should reverse Mr. Tate's convictions and remand for a new trial. With regard to the second issue, the Sixth Amendment rights counsel encompasses the right to have counsel subject the prosecution's case to meaningful adversarial testing, and that right extends to counsel's conduct during closing arguments. Defense counsel in this case alerted the court to a bona fide doubt about the defendant's competence to assist in his defense. They filed the appropriate motion. The trial judge ordered the appropriate hearing, and during that hearing to determine the defendant's fitness, the state bears the burden to establish the defendant's fitness by a preponderance of the evidence. That's a statutory standard in Illinois. In my view, it's a statutory standard that enacts and gives flesh to the constitutional principle, the due process principle, that you can't try to convict or sentence somebody who's not mentally competent to understand what's going on or to assist in their defense. Now, in this case, you have two testifying experts. Dr. Chapman found the defendant fit to stand trial. Dr. Killian found the defendant unfit. There's no question raised in the record about the credentials of either of these experts, and I'm not arguing about the credentials of either of these experts, but they came to opposing conclusions. Now, in closing argument, defense counsel told the jury that he was too deeply involved to, quote, stand up and advocate that you rule one way or another in this case, and he also... Let me ask you a couple questions on that. Sure. If you read the entire closing argument, where he basically comes in and says, you've got something here, you've got something here, we're deep into this. At the end, doesn't he make his argument saying that the unfitness comes from his refusal, his inability to cooperate with the lawyers and tie it up, doesn't that bring it into the area of trial strategy, in effect? We come with clean hands. We come with transparency. We're open, and this guy is off in another zone, and we are unable to get sufficient cooperation to effectively defend him. Your Honor, I've tried to be intellectually honest in presenting this issue. Oh, I'm not arguing with that. I'm not accusing you of that. Certainly, I understand that. The point I was going to make is that I acknowledge that even in that closing argument, there's some advocacy there, okay? So you're not saying it's a chronic type of situation? Right. And I'm not saying it's Hatterer either. I didn't even cite Hatterer because this is clearly not a Hatterer case. But what I'm saying is that the two things counsel did do when you consider the evidentiary standard that the prosecution had to meet, the two things counsel did do basically eviscerated any advocacy on behalf of the defendant. Once counsel gets up in front of the jury and says, I'm number one, I'm not going to be an advocate here, and number two, oh, by the way, yeah, the state has presented ample evidence to support their position. When you have a ponderous standard, the jury's probably sitting there. Defense counsel's just told us we got all we need. We got all we need. What are we doing here? Let's find this guy fit. The hearing's over. And in my view, to answer your question about was this vital strategy, your Honor, once that happened, whatever defense counsel's strategy was doesn't matter. You've got to look at the effect of those two things and what effect it had on the jury. And my position is it eviscerated the case for fitness. And this is a very important matter. It was recognized in Illinois at least as early as people versus person. It was recognized in people versus Sam in more modern times. I know something about that case, by the way. Okay. It is a violation of the Constitution to put a defendant to trial. There's a question of his mental competence to understand the nature of the proceedings for assist in his defense. And in this case, that question was not properly resolved under constitutional standards. And because of that, it eviscerated everything that came after in a very important, highly charged, emotional capital case. And this court should therefore reverse and remand and make them do it again. Start all over. And that concludes my prepared remarks. I would welcome any further questions. I don't think we have them. Thank you very much. Thank you, Your Honor. Thank you, counsel. Counsel? Counsel? Good morning, Your Honor. May it please the court. My name is Sherry Wong. I'm an assistant attorney general here on behalf of the people of the state of Illinois. Your Honor, we would ask this court to affirm the defendant's natural life sentence, the intentional first-degree murders of Kathleen Cade and Amanda Jeffers. I'm actually going to talk about the same issues that the defendant discussed. But before I get to those issues, I'd like to briefly discuss the effect of the governor's commutation on a defendant's claims in this case. The Illinois Supreme Court has held that where a governor commutes a defendant's death sentence, that renders any challenge to that death sentence. So when this case was originally briefed, the defendant had raised seven claims. Claim seven, which challenges the Illinois death penalty statute as violating a pretty versus New Jersey, that claim has now been rendered moot by the governor's commutation. Also, claim four has been rendered partially moot as well. Claim four alleges that the trial court abused its discretion in declining to pose a question to the jury veneer about the defendant's white supremacist beliefs. Whatever effect the trial court's failure to ask the question had at the penalty phase, that question has been rendered moot by the governor's commutation. We would agree that that question is still live for purposes of the guilt phase. And so with respect to that question, the only issue with respect to that claim is whether or not evidence of the defendant's white supremacist beliefs was an integral part of the guilt phase. But any question about whether or not it was an integral part of the penalty phase has been rendered moot by the commutation. Now, turning to the issues that we were talking about this morning with respect to the venue claim, the trial court did not abuse its discretion in declining to move the venue of this trial. As the defendant noted, it is a deferential standard. And Skilling did note specifically that the reason that the standard is an abusive discretion standard is because the trial court sits in the venue where the trial is being held. The trial court hears the pre-trial publicity. The trial court is conducting the voir dire. It hears the answers to the jury questioning. And here, this well-positioned trial judge determined that based on the jurors' answers to the voir dire questioning, changing the venue was not necessary because it would not deprive the defendant of a fair and impartial jury trial. Now, the defendant correctly notes that Skilling establishes a number of factors that this court can consider in determining whether or not a presumption of prejudice is required. But it's important to note that Skilling did not note that these factors were completely exhaustive, nor is any one factor completely dispositive. This court can consider all the factors together. And while it is true that the defendant was convicted of all the counts of which he was charged, as the defendant noted, there was a substantial time gap between when the murders occurred and when the voir dire was happening. It was two years. And specifically, the trial judge noted that after a year had passed, that would be a sufficient amount of time for any feelings of prejudice to have dissipated in the community. So here we have an even longer period of time when the trial court made that factual finding. And I think it's clear from the voir dire questioning, even if you look at the size of White County, and it was a fairly small county, if you look at the survey that was taken and the evidence that was presented at the venue hearing, the survey established that of those who had been asked about the defendant's case, 44% of those who had been asked had still not heard of the defendant's case. And that was after closer in time to when the murders occurred. And if you look at the actual voir dire questioning of the jury veneer, there was still a good 32% of the jurors who were questioned that still had not heard of the defendant's case. And of those who had heard of the defendant's case, less than 50% of those had formed an opinion based on the pretrial publicity. When doing a survey of the voir dire, we looked at the 220 to 230 jurors who were questioned in the case, and it looks like 67 of those jurors were excused for cause based on pretrial publicity. And this amounts to 29 to 30% of the jury veneer. And this is certainly a much smaller percentage of people who had formed an opinion where a presumption of prejudice was required in the cases that were cited by Skilling, such as Urban and Estes and Shepard and all those cases. So the defendant's case, when compared to the cases that the United States Supreme Court cited, Skilling is not one of those extreme types of cases. In addition, the defendant notes the somewhat prejudicial information that was in the pretrial publicity, and there were some news reports that talked about how the defendant had wanted to be guilty, some statements from the defendant's ex-wife, and there was also some statements about his confession. But the defendant only cites to several jurors who had heard about or cited as hearing about those somewhat prejudicial pieces of evidence. And three or four jurors out of a potential jury veneer of 220 does not demonstrate that that information was so widely disseminated such that this court has to presume prejudice on the basis of that entire jury veneer. So this question ultimately comes down to, is the defendant's case one of those extreme cases where a presumption of prejudice should be required? And if we look at the cases from the United States Supreme Court, if we look at the Illinois Supreme Court's decision in Taylor and compare the facts of those cases, in this case it's simply not on the same playing field. And then I'd just briefly like to discuss Issue 2 with respect to the defendant's fitness hearing. Trial counsel here did not render ineffective assistance at the defendant's fitness hearing. It's well established that in order to prevail in a Strickland claim, the defendant has to show both prongs of the Strickland test, both deficient performance and prejudice as a result of that deficient performance. It's also well established that if the defendant can't show one prong, then this court doesn't even have to reach the other prong. And here, even assuming that counsel rendered deficient performance by uttering the words ample, or referring to the State's evidence as ample in his closing argument, there is no reasonable probability that the jury would have found the defendant unfit to stand trial. As the defendant noted, the only issue in this case was whether or not the defendant could actively assist in his defense. And we presented an expert, Dr. Chapman, who testified that the defendant was fully capable of participating in his defense, but chose not to. Isn't it a little closer than that? You've got one argument saying because of the problems that the expert noted, he's incapable. You've got another expert basically saying to the fitness jury, he's capable. And the State arguing, he's just not doing it. He's gaming the system. He's refusing to. And isn't that a closer credibility call for a jury called upon to determine the fitness as to whether this is an impairment or whether this is a volitional act? Well, it would be a closer call, except the State was able to poke a lot of holes in the defense expert's opinion that the defendant was unfit to stand trial. And we pointed this out at length on cross-examination of the defendant's expert. The defendant's expert testified that he was unfit to stand trial because he suffered from this cocaine-induced psychosis. This psychosis was brought on recently by cocaine use, and it caused the defendant to suffer from paranoia, and that interfered with his ability to assist in his defense. But when pressed on cross-examination, Dr. Killian acknowledged that the primary basis of his diagnosis was based on the defendant's false self-reporting, admitted false self-reporting of cocaine use to another doctor. And Dr. Killian was aware of this false self-reporting but did not independently delve into the defendant's cocaine use with the defendant. Did that cross-examination undermine his comment about the existence of paranoia? Cocaine is not the only source of paranoia. Sure. But I think Dr. Killian's opinion about paranoia was primarily based on his cocaine use. I don't know if there's any evidence in the record that said that the defendant independently suffered from paranoia aside from the cocaine use. It was the cocaine use that contributed to the paranoia. And if the doctor's opinion fell apart on the cocaine use, then the jury could infer that the paranoia was not present as well. In addition, Dr. Killian noted that the defendant was actively participating in his defense. He was the one who elected a jury trial at the fitness hearing. He was the one who was also participating in the voir dire. He was actively assisting the attorneys in who to excuse for cause and who to excuse for preeminent challenges. So the defendant was assisting his defense, and the jury heard that. So based on the credible testimony of the state's expert and the obvious clear deficiencies of the defendant's expert, there's no reasonable probability that if counsel had not referred to the state's evidence as ample during the closing argument, that the jury would have found the defendant unfit to stand trial. So we can't demonstrate prejudice. We can't demonstrate prejudice. We can't succeed on his strickling claim. But we would also argue that the defendant can't show that counsel rendered deficient performance during the closing argument as well. As Your Honor noted, when read in its entirety, and counsel's closing argument spanned 15 pages, the jury would not have reasonably understood counsel to have been conceding the state's burden, that the state had proved by a ponderance of the evidence that the defendant was fit to stand trial. Rather, what counsel was trying to do, and this was a reasonable trial strategy, was to acknowledge the people's evidence, acknowledge that the people had presented good evidence in the form of Dr. Chapman's testimony, but then to argue, you should look at our evidence, Dr. Killian's testimony, and you should find that evidence to be more credible. And he did this to preserve credibility with the jury, given the state's case. And this was a perfectly reasonable trial strategy, and because it was, it doesn't constitute deficient performance. Now, with respect to the remedy, if this Court does find that the defendant prevails in the strickling claim, the remedy is not reversal and remand for a new trial. Rather, it would be a remand for a retrospective fitness hearing. The Illinois Supreme Court noted in cases such as Burgess and Neal and Kincaid that a retrospective fitness hearing can be appropriate on a case-by-case basis, and this would be one of those cases in which a retrospective fitness hearing would be appropriate. Here we had a contemporaneous fitness examination by two doctors and a contemporaneous fitness hearing. The trial was not so long ago. It was only about four years ago. These doctors could go back to their reports and testify as to their opinions regarding the defendant's fitness. This is a different question than what was presented in Sando. In Sando, the question was whether or not the trial court erred in failing to conduct a fitness hearing or a bona fide doubt of fitness had been raised. In that case, there was no fitness hearing and there was no examination by doctors, so it would have been much more difficult to do a fitness hearing in that case. Here, it would not be as hard. So if this Court were to remand for a retrospective fitness hearing, and the newly-constituted jury found that the defendant was fit to stand trial, then there would be no need for a complete retrial. Do Your Honors have any other questions on any of the other issues? I don't think we do. Thank you. Thank you, Counsel. Excuse me. Counsel? I'm going to go a little out of order based on the questions. Any order you want. Okay. Thank you, Your Honor. Your question about isn't this a close probability call on the fitness issue. Yes, Your Honor, I agree. It is a closer call than what the State is making out here. Basically, it doesn't matter how much the State says now that they pulled holes in the defense expert's theory. Oh, and by the way, there were some holes pulled in Dr. Chapman's theories, too. That's certainly in evidence. I mean, he got a question from defense counsel. Well, gee, doesn't this guy's sincere belief that white supremacists are going to come in and take over white county, doesn't that sound a little crazy? Doesn't that amount to a delusion? Chapman says, no, it's not a delusion. So, you know, some holes were poked in his theories, too. Close case. And the more important idea to keep in mind about that whole issue is that this was a question for the jury. And that's precisely my point. That's why what happened in defense counsel's closing argument is so egregious and so important. It is the jury that makes credibility calls. It is the jury in this case that had to decide when you have two opposing experts, well-qualified, explain their findings, they both examined the defendant extensively. I would argue, by the way, that Dr. Killian made a pretty good record that he examined the defendant even more extensively. He said he examined him for a total of ten hours over several days. In that situation, it's the jury's credibility call. And in a situation where it's the jury's credibility call, when you have defense counsel get up there and say, the state's presented ample evidence. I'm not going to be an advocate. And the state, oh, by the way, the state's only got to prove their case by 51 percent. It's over. You've basically advocated your position to the jury. And it's important because you've still got the question of, was this guy fit to go through everything that they went through in that capital trial proceeding? With regard to the retrospective fitness jury decisions that counsel discussed, such as Burgess and Kincaid, Burgess and Kincaid and those other decisions, they did not limit, they did not overrule. They didn't even mention Sanam. I'm sure of that. I'm not sure whether or not they mentioned Burson, the case going back to 1957. But it's important to look at the cases which the state cites in context. Those cases involve, after the facts, revelations that a particular defendant had been subjected to psychotropic medication, in some of those cases there was absolutely no other evidence presented whatsoever, pre-trial, trial, or sentencing hearing, which raises one fight down to the defendant's fitness. In this case, you've got defense counsel filing a motion before trial ever began that this guy has problems. We think he may have a fitness problem because he's not cooperating with the defense. The same kind of thing happened in Sanam. There were red lights going up throughout the pre-trial proceedings and the trial proceedings and even the sentencing proceedings in Sanam. Read the case. The judge in Sanam said, he said on the record, the question I have now is whether you would be even competent to proceed with this hearing. When stuff like that happens contemporaneously with the proceedings we're talking about, Sanam and Burson say, if you don't resolve those fitness issues, you wipe everything out and you start over. And that's what we're asking for today. Thank you, counsel. Thank you, Your Honor. We appreciate the briefs and arguments of all counsel. We will take the case under advisement.